**Brittani HENRY, et al., Plaintiffs,**

v.

**Lance HIMES, et al., Defendants.**

**Case No. 1:14–cv–129.**

United States District Court, S.D. Ohio.

Signed April 14, 2014.

---

**1038**

Alphonse Adam Gerhardstein, Jacklyn
Gonzales Martin, Jennifer Lynn Branch,
Gerhardstein & Branch Co. LPA, Lisa Tal-
madge Meeks, Newman & Meeks Co.
LPA, Ellen Essig, Cincinnati, OH, Mar-
shall Currey Cook, Susan L. Sommer,
Lambda Legal Defense and Education
Fund, Inc., New York, NY, Paul D. Castil-
lo, Lambda Legal Defense and Education
Fund, Inc., Dallas, TX, for Plaintiffs.

Peter J. Stackpole, City of Cincinnati,
Cincinnati, OH, Bridget C. Coontz, Ryan
L. Richardson, Zachery Paul Keller, Ohio
Attorney General, Columbus, OH, for De-
fendants.

### ORDER GRANTING PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

TIMOTHY S. BLACK, District Judge.

On December 23, 2013, this Court ruled
in no uncertain terms that:

"Article 15, Section 11, of the Ohio
Constitution, and Ohio Revised Code
Section 3101.01(C) [Ohio's "marriage
recognition bans"], violate rights secured
by the Fourteenth Amendment to the
United States Constitution in that same-
sex couples married in jurisdictions
where same-sex marriage is lawful, who
seek to have their out-of-state marriage
recognized and accepted as legal in
Ohio, are denied their fundamental right
to marriage recognition without due pro-
cess of law; and are denied their funda-
mental right to equal protection of the
laws when Ohio does recognize compara-
ble heterosexual marriages from other
jurisdictions, even if obtained to circum-
vent Ohio law."

*Obergefell v. Wymyslo*, 962 F.Supp.2d 968, 997 (S.D.Ohio 2013).

The *Obergefell* ruling was constrained by the limited relief requested by the Plaintiffs in that case, but the analysis was nevertheless universal and unmitigated, and it directly compels the Court's conclusion today. The record before the Court, which includes the judicially-noticed record in *Obergefell*, is staggeringly devoid of any legitimate justification for the State's ongoing arbitrary discrimination on the basis of sexual orientation, and, therefore, *Ohio's marriage recognition bans are facially unconstitutional and unenforceable under any circumstances.*[1]

It is this Court's responsibility to give meaning and effect to the guarantees of the federal constitution for all American citizens, and that responsibility is never more pressing than when the fundamental rights of some minority of citizens are impacted by the legislative power of the majority. As the Supreme Court explained over 70 years ago:

The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other *fundamental rights may not be submitted to vote; they depend on the outcome of no elections.*

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (emphasis supplied). This principle is embodied by the Court's decision today and by the *ten out of ten federal rulings since the Supreme Court's holding in United States v. Windsor—all declaring unconstitutional and enjoining similar bans in states across the country.*[2] The pressing and clear nature of the ongoing constitutional violations embodied by these kinds of state laws is evidenced by the fact the Attorney General of the United States and eight state attorneys general have refused to

1. The Court's Order today does NOT require Ohio to authorize the performance of same-sex marriage in Ohio. Today's ruling merely requires Ohio to *recognize* valid same-sex marriages lawfully performed in states which do authorize such marriages.

2. *See, e.g., Kitchen v. Herbert,* 961 F.Supp.2d 1181, 1216 (D.Utah 2013) (permanently enjoining **Utah** anti-celebration provisions on due process and equal protection grounds); *Obergefell,* 962 F.Supp.2d at 997–98 (permanently enjoining as to plaintiffs enforcement of **Ohio** anti-recognition provisions on due process and equal protection grounds); *Bishop v. United States ex rel. Holder,* 962 F.Supp.2d 1252, 1295–97 (N.D.Okla.2014) (permanently enjoining **Oklahoma's** anti-celebration provisions on equal protection grounds); *Bourke v. Beshear,* 996 F.Supp.2d 542, 544–45, 2014 WL 556729, at *1 (W.D.Ky. Feb. 2, 2014) (declaring **Kentucky's** anti-recognition provisions unconstitutional on equal protection grounds); *Bostic v. Rainey,* 970 F.Supp.2d 456, 483–84 (E.D.Va.2014) (finding **Virginia's** anti-celebration and anti-recognition laws unconstitutional on due process and equal protection grounds, and preliminarily enjoining enforcement); *Lee v. Orr,* 2014 WL 683680 (N.D.Ill. Feb. 21, 2014) (declaring **Illinois** celebration ban unconstitutional on equal protection grounds); *De Leon v. Perry,* 975 F.Supp.2d 632, 639–40, 662–63 (W.D.Tex.2014) (preliminarily enjoining **Texas** anti-celebration and anti-recognition provisions on equal protection and due process grounds); *Tanco v. Haslam,* 7 F.Supp.3d 759, 769, 772, 2014 WL 997525, at *6, *9 (M.D.Tenn. Mar. 14, 2014) (enjoining enforcement of **Tennessee** anti-recognition provisions on equal protection grounds); *DeBoer v. Snyder,* 973 F.Supp.2d 757, 775 (E.D.Mich.2014) (permanently enjoining **Michigan** anti-celebration provisions on equal protection grounds); *Baskin v. Bogan* (S.D.Ind. April 10, 2014) (J. Young) (temporarily enjoining **Indiana's** marriage recognition ban).

defend provisions similar to Ohio's marriage recognition bans. (Doc. 25 at 2).

This civil action is now before the Court on Plaintiffs' Motion for Declaratory Judgment and Permanent Injunction (Doc. 18) and the parties' responsive memoranda. (Docs. 20 and 25). Plaintiffs include four same-sex couples married in jurisdictions that provide for such marriages, including three female couples who are expecting children conceived via anonymous donors within the next few months and one male couple with an Ohio-born adopted son. All four couples are seeking to have the names of both parents recorded on their children's Ohio birth certificates. More specifically, Plaintiffs seek a declaration that Ohio's refusal to recognize valid same-sex marriages is unconstitutional, a permanent injunction prohibiting Defendants and their officers and agents from enforcing those bans or denying full faith and credit to decrees of adoption duly obtained by same-sex couples in other jurisdictions, and the issuance of birth certificates for the Plaintiffs' children listing both same-sex parents. (Doc. 18 at 1–2).

## I. ESTABLISHED FACTS

### A. Marriage Law in Ohio [3]

The general rule in the United States for interstate marriage recognition is the "place of celebration rule," or *lex loci contractus,* which provides that marriages valid where celebrated are valid everywhere. Historically, Ohio has recognized marriages that would be invalid if performed in Ohio, but are valid in the jurisdiction where celebrated. This is true even when such marriages clearly violate Ohio law and are entered into outside of Ohio with the purpose of evading Ohio law with respect to marriage. Ohio departed from this tradition in 2004 to adopt its marriage

recognition ban. Prior to 2004, the Ohio legislature had never passed a law denying recognition to a specific type of marriage solemnized outside of the state.

Ohio Revised Code Section 3101 was amended in 2004 to prohibit same-sex marriages in the state and to prohibit recognition of same-sex marriages from other states. Sub-section (C) provides the following:

(1) Any marriage between persons of the same sex is against the strong public policy of this state. Any marriage between persons of the same sex shall have no legal force or effect in this state and, if attempted to be entered into in this state, is void ab initio and shall not be recognized by this state.

(2) Any marriage entered into by persons of the same sex in any other jurisdiction shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state.

(3) The recognition or extension by the state of the specific statutory benefits of a legal marriage to nonmarital relationships between persons of the same sex or different sexes is against the strong public policy of this state. Any public act, record, or judicial proceeding of this state, as defined in section 9.82 of the Revised Code, that extends the specific statutory benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes is void ab initio . . .

(4) Any public act, record, or judicial proceeding of any other state, country, or other jurisdiction outside this state that extends the specific benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes shall be considered and treat-

---

3. *See Obergefell,* 962 F.Supp.2d at 974–75.

ed in all respects as having no legal force or effect in this state and shall not be recognized by this state.

Ohio Rev.Code Ann. § 3101.01.

Also adopted in 2004 was an amendment to the Ohio Constitution, which states:

Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.

Ohio Const. art. XV, § 11.

## B. Plaintiffs

### 1. Henry/Rogers Family[4]

Plaintiffs Brittani Henry and Brittni Rogers met in 2008. They have been in a loving, committed same-sex relationship since that time. On January 17, 2014, they were validly married in the state of New York, which state legally recognizes their marriage. Having established a home together and enjoying the support of their families, the couple decided they wanted to have children. Henry became pregnant through artificial insemination ("AI"), and she is due to deliver a baby boy in June 2014. The sperm donor is anonymous. Without action by this Court, Defendants Jones and Himes will list only one of these Plaintiffs as their son's parent on his birth certificate.

### 2. Yorksmith Family[5]

Nicole and Pam Yorksmith met and fell in love in 2006. They were married on October 14, 2008 in California, which state legally recognizes their marriage. The

Yorksmith family already includes a three-year-old son born in Cincinnati in 2010. He was conceived through AI using an anonymous sperm donor. Nicole is their son's birth mother, but Pam was fully engaged in the AI process, pregnancy, and birth. They share the ongoing role as parents. However, only Nicole is listed on their son's birth certificate because Defendants will not list the names of both same-sex married parents on the birth certificates of their children conceived through AI.

Failing to have both parents listed on their son's birth certificate has caused the Yorksmith Family great concern. They have created documents attempting to ensure that Pam will be recognized with authority to approve medical care, deal with childcare workers and teachers, travel alone with their son, and otherwise address all the issues parents must resolve. Nicole and Pam allege that Defendants' denial of recognition of Pam's role as parent to their child is degrading and humiliating for the family.

Now Nicole is pregnant with their second child. She expects to give birth in June in Cincinnati. Nicole and Pam are married and will continue to be a married couple when their second child is born, but Defendants have taken the position that they are prohibited under Ohio law from recognizing the California marriage and both married spouses on the birth certificate of the Yorksmiths' baby boy. Without action by this Court, Defendants Jones and Himes will list only one of these Plaintiffs as their son's parent on his birth certificate.

### 3. Noe/McCracken Family[6]

Plaintiffs Kelly Noe and Kelly McCracken have been in a loving, committed same-

---

**4.** *See* Doc. 4–2.

**5.** *See* Doc. 4–3.

**6.** *See* Doc. 4–4.

sex relationship since 2009. From the beginning of their time together, they agreed that they would have children. They were married in 2011 in the state of Massachusetts, which legally recognizes their marriage. Noe became pregnant through AI using an anonymous sperm donor. She expects to deliver a baby in a Cincinnati hospital in June 2014. McCracken consented to and was a full participant in the decision to build their family using AI. Noe and McCracken are married now and will continue to be a married couple when their child is born, but Defendants have taken the position that they are prohibited under Ohio law from recognizing the Massachusetts marriage and the marital presumption of parentage that should apply to this family for purposes of naming both parents on the baby's birth certificate. Without action by this Court, Defendants Jones and Himes will list only one of these Plaintiffs as a parent on the baby's birth certificate when the child is born.

#### 4. Vitale/Talmas Family [7]

Plaintiffs Joseph J. Vitale and Robert Talmas met in 1997. They live in New York City, where they work as corporate executives. Vitale and Talmas married on September 20, 2011 in New York, which state legally recognizes their marriage. The couple commenced work with Plaintiff Adoption S.T.A.R. to start a family through adoption. Adopted Child Doe was born in Ohio in 2013 and custody was transferred to Plaintiff Adoption S.T.A.R. shortly after birth. Vitale and Talmas immediately assumed physical custody and welcomed their son into their home. On January 17, 2014, an Order of Adoption of Adopted Child Doe was duly issued by the Surrogate's Court of the State of New York, County of New York, naming both

Vitale and Talmas as full legal parents of Adopted Child Doe.

Plaintiffs are applying to the Ohio Department of Health, Office of Vital Statistics, for an amended birth certificate listing Adopted Child Doe's adoptive name and naming Vitale and Talmas as his adoptive parents. Based on the experience of Plaintiff Adoption S.T.A.R. with other clients and their direct communications with Defendant Himes's staff at the Ohio Department of Health, Adopted Child Doe will be denied a birth certificate that lists both men as parents. On the other hand, heterosexual couples married in New York who secure an order of adoption from a New York court regarding a child born in Ohio have the child's adoptive name placed on his or her birth certificate along with the names of both spouses as the parents of the adoptive child as a matter of course.

Without action by this Court, Defendant Himes will allow only one of these Plaintiffs to be listed as the parent on the birth certificate of Adopted Child Doe. Vitale and Talmas object to being forced to choose which one of them to be recognized as their son's parent and to allowing this vitally important document to misrepresent the status of their family. They do not wish to expose their son to the life-long risks and harms they allege are attendant to having only one of his parents listed on his birth certificate.

#### 5. Adoption S.T.A.R. [8]

Plaintiffs allege that prior to Governor Kasich, Attorney General DeWine, and prior-Defendant Wymyslo taking office in January, 2011, the Ohio Department of Health provided same-sex married couples such as Plaintiffs Vitale and Talmas with birth certificates for their adopted chil-

---

**7.** *See* Doc. 4–5.

**8.** *See* Doc. 4–6.

dren, consistent with those requested in the Complaint. (Doc. 1). Defendant Himes has changed that practice, and now denies married same-sex couples with out-of-state adoption decrees amended birth certificates for their Ohio-born children naming both adoptive parents. (*See* Docs. 4–6, 4–7, and 4–8).

As a result of Ohio's practice of not amending birth certificates for the adopted children of married same-sex parents, Plaintiff Adoption S.T.A.R. alleges it has been forced to change its placement agreements to inform potential same-sex adoptive parents that they will not be able to receive an accurate amended birth certificate for adopted children born in Ohio. Adoption S.T.A.R. alleges it has expended unbudgeted time and money to change its agreements and advise same-sex adoptive parents of Ohio's discriminatory practice. It alleges it has devoted extra time and money to cases like that of Plaintiffs Vitale and Talmas involving same-sex married couples who adopt children born in Ohio through court actions in other states. Adoption S.T.A.R. alleges that the process to seek an accurate birth certificate for Adopted Child Doe—including participation in this lawsuit—is expected to be a protracted effort that will cause the expenditure of extra time and money.

Adoption S.T.A.R. has served same-sex married couples in previous adoption cases and is currently serving other same-sex married couples in various stages of the adoption process in other states for children born in Ohio. Adoption S.T.A.R. alleges it will serve additional same-sex married couples in this capacity in the future. Adoption S.T.A.R. alleges that its clients' inability to secure amended birth certificates from Defendant Himes accurately listing both same-sex married persons as the legal parents of their adopted children imposes a significant burden on the agen-cy's ability to provide adequate and equitable adoption services to its clients, results in incomplete adoptions and loss of revenue, and frustrates the very purpose of providing adoption services to its clients in the first place.

## II. STANDARD OF REVIEW

Plaintiffs go beyond the as-applied challenge pursued in *Obergefell* and now seek a declaration that Ohio's marriage recognition ban is facially unconstitutional, invalid, and unenforceable. (Doc. 18 at 15). In other words, Plaintiffs allege that "no set of circumstances exists under which the [challenged marriage recognition ban] would be valid," and the ban should therefore be struck down in its entirety. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also De Leon v. Perry*, 975 F.Supp.2d 632 (W.D.Tex.2014) (declaring that Texas's ban on same-sex marriages and marriage recognition "fails the constitutional facial challenge because ... Defendants have failed to provide any—and the Court finds no—rational basis that banning same-sex marriage furthers a legitimate governmental interest").

 "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir.2012); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir.2006) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir.1998)); *Obergefell*, 962 F.Supp.2d at 977. It lies within the sound discretion of the district court to grant or deny a motion for permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *Obergefell*, 962 F.Supp.2d at

977 (citing *Kallstrom,* 136 F.3d at 1067); *Wayne v. Vill. of Sebring,* 36 F.3d 517, 531 (6th Cir.1994).

The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. Fed. R.Civ.P. 57. In the Sixth Circuit, "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Savoie v. Martin,* 673 F.3d 488, 495–96 (6th Cir. 2012) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.,* 746 F.2d 323, 326 (6th Cir.1984)); *see also Obergefell,* 962 F.Supp.2d at 977. Both circumstances arise here.

### III. ANALYSIS

This Court has already held in *Obergefell* that Ohio's refusal to recognize the out-of-state marriages of same-sex couples violates the Fourteenth Amendment due process "right not to be deprived of one's already-existing legal marriage and its attendant benefits and protections." 962 F.Supp.2d at 978. In the birth certificate context, much like in the death certificate context, the marriage recognition ban denies same-sex married couples the "attendant benefits and protections" associated with state marriage recognition and documentation. This Court further held in *Obergefell* that the marriage recognition ban "violate[s] Plaintiffs' constitutional rights by denying them equal protection of the laws." *Id.* at 983. Finally, this Court declared the marriage recognition ban unconstitutional and unenforceable in the death certificate context.

The Court's analysis in *Obergefell* controls here, and compels not only the con-clusion that the marriage recognition ban is unenforceable in the birth certificate context, but that it is facially unconstitutional and unenforceable in any context whatsoever.

### A. Facial Challenge

Despite the limited relief pursued by the Plaintiffs in that case, this Court's conclusion in *Obergefell* clearly and intentionally expressed the facial invalidity of Ohio's marriage recognition ban, not only as applied to the Plaintiffs and the issue of death certificates, but in any application to any married same-sex couple. 962 F.Supp.2d at 997. Ohio's marriage recognition ban embodies an unequivocal, purposeful, and explicitly discriminatory classification, singling out same-sex couples alone, for disrespect of their out-of-state marriages and denial of their fundamental liberties. This classification, relegating lesbian and gay married couples to a second-class status in which *only their marriages* are deemed void in Ohio, is the core constitutional violation all of the Plaintiffs challenge.

The United States Constitution "neither knows nor tolerates classes among citizens." *Romer v. Evans,* 517 U.S. 620, 623, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (emphasis supplied). There can be no circumstance under which this discriminatory classification is constitutional, as it was intended to, and on its face does, stigmatize and disadvantage same-sex couples and their families, denying only to them protected rights to recognition of their marriages and violating the guarantee of equal protection. Indeed, this Court already held as much in *Obergefell,* finding that Ohio enacted the marriage recognition bans with discriminatory animus and without a single legitimate justification. 962 F.Supp.2d at 995.

As noted, following the Supreme Court's ruling in *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), a spate of federal courts from across the nation has issued rulings similar to *Obergefell,* holding that a state's ban on the right of same-sex couples to marry or to have their out-of-state marriages recognized violates the constitutional due process and equal protection rights of these families. There is a growing national judicial consensus that state marriage laws treating heterosexual and same-sex couples differently violate the Fourteenth Amendment, and it is this Court's responsibility to act decisively to protect rights secured by the United States Constitution.

The Supreme Court explained in *Citizens United v. Federal Election Commission* that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). The distinction between the two "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.* Even in a case explicitly framed only as an as-applied challenge (which this case is not), the Court has authority to facially invalidate a challenged law. " '[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.' " *Id.* at 331, 130 S.Ct. 876 (quoting Richard H. Fallon, Jr., *As-Applied and Facial Chal-*

*lenges and Third–Party Standing,* 113 HARV. L.REV. 1321, 1339 (2000)).

It is therefore well within the Court's discretion to find the marriage ban facially unconstitutional and unenforceable in all circumstances on the record before it, and given the Court's extensive and comprehensive analysis in *Obergefell* pointing to the appropriateness of just such a conclusion, Defendants have been on notice of the likely facial unconstitutionality of the marriage ban since before this case was ever filed.

## B. Due Process Clause

The Due Process Clause of the Fourteenth Amendment establishes that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects "vital personal rights essential to the orderly pursuit of happiness by free men," more commonly referred to as "fundamental rights." *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). There are a number of fundamental rights and/or liberty interests protected by the Due Process clause that are implicated by the marriage recognition ban, including the right to marry, the right to remain married,[9] and the right to parental autonomy.

### 1. Right to Marry

"The freedom to marry has long been recognized" as a fundamental right protected by the Due Process Clause. *Loving,* 388 U.S. at 12, 87 S.Ct. 1817 (1967).[10]

---

9. The concept of the right to remain married as a liberty interest protected by the Due Process Clause is advanced by Professor Steve Sanders in his article *The Constitutional Right to (Keep Your) Same–Sex Marriage,* 110 MICH. L.REV. 1421 (2011).

10. *See also Turner v. Safley,* 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("The

decision to marry is a fundamental right"); *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition"); *Griswold v. Connecticut,* 381 U.S. 479, 485–486, 85 S.Ct. 1678, 14 L.Ed.2d 510

Some courts have not found that a right to same-sex marriage is implicated in the fundamental right to marry. *See, e.g., Jackson v. Abercrombie*, 884 F.Supp.2d 1065, 1094–98 (D.Haw.2012).[11] However, neither the Sixth Circuit nor the Supreme Court have spoken on the issue, and this Court finds no reasonable basis on which to exclude gay men, lesbians, and others who wish to enter into same-sex marriages from this culturally foundational institution.

■■■■ First, while states have a legitimate interest in regulating and promoting marriage, the fundamental right to marry belongs to the individual. Accordingly, *"the regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made."* *Hodgson v. Minnesota*, 497 U.S. 417, 435, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (emphasis supplied); *see also Loving*, 388 U.S. at 12, 87 S.Ct. 1817 ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("[T]he Constitution undoubtedly imposes constraints on the

State's power to control the selection of one's spouse . . .").

The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry by reframing a plaintiff's asserted right to marry as a more limited right that is about the characteristics of the couple seeking marriage. In individual cases regarding parties to potential marriages with a wide variety of characteristics, the Court consistently describes a general "fundamental right to marry" rather than "the right to interracial marriage," "the right to inmate marriage," or "the right of people owing child support to marry." *See Golinski v. U.S. Office of Pers. Mgmt.*, 824 F.Supp.2d 968, 982 n. 5 (N.D.Cal.2012) (citing *Loving*, 388 U.S. at 12, 87 S.Ct. 1817; *Turner*, 482 U.S. at 94–96, 107 S.Ct. 2254); *Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *accord In re Marriage Cases*, 43 Cal.4th 757, 76 Cal.Rptr.3d 683, 183 P.3d 384, 421 n. 33 (2008) (*Turner* "did not characterize the constitutional right at issue as 'the right to inmate marriage'").

In *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), the Supreme Court held that the right of consenting adults (including same-sex couples) to engage in private, sexual intimacy is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the

(1965) (intrusions into the "sacred precincts of marital bedrooms" offend rights "older than the Bill of Rights"); *id.* at 495–496, 85 S.Ct. 1678 (Goldberg, J., concurring) (the law in question "disrupt[ed] the traditional relation of the family—a relation as old and as fundamental as our entire civilization"); *see generally Washington v. Glucksberg*, 521 U.S. 702, 727 n. 19, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citing cases).

11. *See also Wilson v. Ake*, 354 F.Supp.2d 1298, 1306–07 (M.D.Fla.2005) ("No federal court has recognized that [due process] . . . includes the right to marry a person of the

same sex") (internal citation omitted); *Conaway v. Deane*, 401 Md. 219, 932 A.2d 571, 628 (Md.App.2007) ("[V]irtually every court to have considered the issue has held that same-sex marriage is not constitutionally protected as fundamental in either their state or the Nation as a whole"); *Hernandez v. Robles*, 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 9 (2006) ("The right to marry is unquestionably a fundamental right . . . The right to marry someone of the same sex, however, is not "deeply rooted," it has not even been asserted until relatively recent times").

historical existence of sodomy laws and their use against gay people. For the same reasons, the fundamental right to marry is "deeply rooted in this Nation's history and tradition" for purposes of constitutional protection even though same-sex couples have not historically been allowed to exercise that right. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *Id.* at 572, 123 S.Ct. 2472 (citation omitted). While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right, once that right is recognized as one that due process protects.

■ "Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights." *In re Marriage Cases*, 76 Cal.Rptr.3d 683, 183 P.3d at 430 (quotation omitted). For example, when the Supreme Court held that anti-miscegenation laws violated the fundamental right to marry in *Loving*, it did so despite a long tradition of excluding interracial couples from marriage. *Planned Parenthood v. Casey*, 505 U.S. 833, 847–48, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("[I]nterracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving* ..."); *Lawrence*, 539 U.S. at

577–78, 123 S.Ct. 2472 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack") (citation omitted). Indeed, the fact that a form of discrimination has been "traditional" is a reason to be more skeptical of its rationality and cause for courts to be especially vigilant.

Cases subsequent to *Loving* have similarly confirmed that **the fundamental right to marry is available even to those who have not traditionally been eligible to exercise that right.** See *Boddie v. Connecticut*, 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (states may not require indigent individuals to pay court fees in order to obtain a divorce, since doing so unduly burdened their fundamental right to marry again); *see also Zablocki*, 434 U.S. at 388–90, 98 S.Ct. 673 (state may not condition ability to marry on fulfillment of existing child support obligations). Similarly, the right to marry as traditionally understood in this country did not extend to people in prison. See Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L.Rev. 275, 277–79 (1985). Nevertheless, in *Turner*, 482 U.S. at 95–97, 107 S.Ct. 2254, the Supreme Court held that a state cannot restrict a prisoner's ability to marry without sufficient justification. When analyzing other fundamental rights and liberty interests in other contexts, the Supreme Court has consistently adhered to the principle that **a fundamental right, once recognized, properly belongs to everyone.**[12]

---

12. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (an individual involuntarily committed to a custodial facility because of a disability retained liberty interests including a right to freedom from bodily restraint, thus departing from a longstanding historical tradition in which people with serious disabilities were

not viewed as enjoying such substantive due process rights and were routinely subjected to bodily restraints in institutions); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (striking down a ban on distributing contraceptives to unmarried persons, building on a holding in *Griswold*, 381 U.S. at 486, 85 S.Ct. 1678, that states could

Consequently, based on the foregoing, the right to marriage is a fundamental right that is denied to same-sex couples in Ohio by the marriage recognition bans.

### 2. Right of Marriage Recognition

Defendants also violate the married Plaintiffs' right to remain married by enforcing the marriage bans, which right this Court has already identified as "a fundamental liberty interest appropriately protected by the Due Process Clause of the United States Constitution." *Obergefell*, 962 F.Supp.2d at 978. "When a state effectively terminates the marriage of a same-sex couple married in another jurisdiction, it intrudes into the realm of private marital, family, and intimate relations specifically protected by the Supreme Court." *Id.* at 979; *see also Windsor*, 133 S.Ct. at 2694 (When one jurisdiction refuses recognition of family relationships legally established in another, "the differentiation demeans the couple, whose moral and sexual choices the Constitution protects ... and whose relationship the State has sought to dignify"). *As the Supreme Court has held: this differential treatment "humiliates tens of thousands of children now being raised by same-sex couples,"* which group includes Adopted Child Doe and the children who will be born to the Henry/Rogers, Yorksmith, and Noe/McCracken families. *Windsor*, 133 S.Ct. at 2694.

### 3. Right to Parental Authority

Finally, the marriage recognition bans also implicate the parenting rights of same-sex married couples with children. The Constitution accords parents significant rights in the care and control of their children. *See Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Parents enjoy unique rights to make crucial decisions for their children, including decisions about schooling, religion, medical care, and with whom the child may have contact. *See, e.g., id.* (medical decisions); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (education and religion); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (education); *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (visitation with relatives). U.S. Supreme Court rulings, reflected in state laws, make clear that these parental rights are fundamental and may be curtailed only under exceptional circumstances. *See Troxel*, 530 U.S. at 66, 120 S.Ct. 2054; *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *see also, e.g., In re D.A.*, 113 Ohio St.3d 88, 862 N.E.2d 829, 832 (2007) (citing Ohio cases on parents' "paramount" right to custody of their children).

### 4. Level of Scrutiny

As a general matter, the Supreme Court applies strict scrutiny when a state law encroaches on a fundamental right, and thus such scrutiny is appropriate in the context of the right to marry and the right to parental authority. *See, e.g., Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The right to marriage recognition has not been expressly recognized as "fundamental," however, and in the previously referenced set of cases establishing the highly-protected status of existing marriage, family, and intimate relationships, the Supreme Court has often applied an

---

not prohibit the use of contraceptives by married persons); *Lawrence*, 539 U.S. at 566–67, 123 S.Ct. 2472 (lesbian and gay Americans could not be excluded from the existing fundamental right to sexual intimacy, even though historically they had often been prohibited from full enjoyment of that right).

intermediate standard of review falling in between rational basis and strict scrutiny. *See, e.g., Moore,* 431 U.S. at 503, 97 S.Ct. 1932 (1977) (balancing the state interests advanced and the extent to which they are served by the challenged law against the burden on plaintiff's rights); *Zablocki,* 434 U.S. at 374, 98 S.Ct. 673 (same). As this Court held in *Obergefell,* "the balancing approach of intermediate scrutiny is appropriate in this similar instance where Ohio is intruding into—and in fact erasing—Plaintiffs' already-established marital and family relations." 962 F.Supp.2d at 979.

### 5. Burden on Plaintiffs

When couples—including same-sex couples—enter into marriage, it generally involves long-term plans for how they will organize their finances, property, and family lives. "In an age of widespread travel and ease of mobility, it would create inordinate confusion and defy the reasonable expectations of citizens whose marriage is valid in one state to hold that marriage invalid elsewhere." *In re Estate of Lenherr,* 455 Pa. 225, 314 A.2d 255, 258 (1974). Married couples moving from state to state have an expectation that their marriage and, more concretely, the property interests involved with it—including bank accounts, inheritance rights, property, and other rights and benefits associated with marriage—will follow them.

*When a state effectively terminates the marriage of a same-sex couple married in another jurisdiction by refusing to recognize the marriage, that state unlawfully intrudes into the realm of private marital, family, and intimate relations specifically protected by the Supreme Court.* After *Lawrence,* same-sex relationships fall squarely within this sphere, and when it comes to same-sex couples, a state may not "seek to control

a personal relationship," "define the meaning of the relationship," or "set its boundaries absent injury to a person or abuse of an institution the law protects." *Lawrence,* 539 U.S. at 578, 123 S.Ct. 2472.

For example, when a parent's legal relationship to his or her child is terminated by the state, it must present clear and convincing evidence supporting its action to overcome the burden of its loss, *Santosky v. Kramer,* 455 U.S. 745, 753, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); and, here, a similar legal familial relationship is terminated by Ohio's marriage recognition ban. Moreover, the official statutory and constitutional establishment of same-sex couples married in other jurisdictions as a disfavored and disadvantaged subset of relationships has a destabilizing and stigmatizing impact on those relationships. In striking down the statutory provision that had denied gay and lesbian couples federal recognition of their otherwise valid marriages in *Windsor,* the Supreme Court observed:

> [The relevant statute] tells those couples, and all the world, that their otherwise valid marriages are unworthy of ... recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. *The differentiation demeans the couple, whose moral and sexual choices the Constitution protects ... And it humiliates tens of thousands of children now being raised by same-sex couples.* The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

133 S.Ct. at 2694 (emphasis supplied).

In the family law context, while opposite-sex married couples can invoke stepparent adoption procedures or adopt children together, same-sex married couples cannot. Ohio courts allow an individual

gay or lesbian person to adopt a child, but not a same-sex couple. *Obergefell*, 962 F.Supp.2d at 980. Same-sex couples are denied local and state tax benefits available to heterosexual married couples, denied access to entitlement programs (Medicaid, food stamps, welfare benefits, *etc.*) available to heterosexual married couples and their families, barred by hospital staff and/or relatives from their long-time partners' bedsides during serious and final illnesses due to lack of legally-recognized relationship status, denied the remedy of loss of consortium when a spouse is seriously injured through the acts of another, denied the remedy of a wrongful death claim when a spouse is fatally injured through the wrongful acts of another, and evicted from their homes following a spouse's death because same-sex spouses are considered complete strangers to each other in the eyes of the law. *Id.*

*Identification on the child's birth certificate is the basic currency by which parents can freely exercise these protected parental rights and responsibilities.* It is also the only common governmentally-conferred, uniformly-recognized, readily-accepted record that establishes identity, parentage, and citizenship, and it is required in an array of legal contexts. *Obtaining a birth certificate that accurately identifies both parents of a child born using anonymous donor insemina-tion or adopted by those parents is vitally important for multiple purposes.* The birth certificate can be critical to registering the child in school;[13] determining the parents' (and child's) right to make medical decisions at critical moments; obtaining a social security card for the child;[14] obtaining social security survivor benefits for the child in the event of a parent's death; establishing a legal parent-child relationship for inheritance purposes in the event of a parent's death;[15] claiming the child as a dependent on the parent's insurance plan; claiming the child as a dependent for purposes of federal income taxes; and obtaining a passport for the child and traveling internationally.[16] *The inability to obtain an accurate birth certificate saddles the child with the life-long disability of a government identity document that does not reflect the child's parentage and burdens the ability of the child's parents to exercise their parental rights and responsibilities.*

The benefits of state-sanctioned marriage are extensive, and the injuries raised by Plaintiffs represent just a portion of the harm suffered by same-sex married couples due to Ohio's refusal to recognize and give legal effect to their lawful unions.

### 6. Potential State Interests

 Defendants advance a number of interests in support of Ohio's marriage

---

**13.** *See* Ohio Rev.Code Ann. § 3313.672(A)(1) (birth certificate generally must be presented at time of initial entry into public or nonpublic school).

**14.** *See* Social Security Administration, Social Security Numbers for Children, http://www.ssa.gov/pubs/EN–05–0023. pdf# nameddest=adoptiveparents (last visited Feb. 26, 2014).

**15.** *See Sefcik v. Mouyos*, 171 Ohio App.3d 14, 869 N.E.2d 105, 108 (2007) (noting that a child's birth certificate is *prima facie* evidence of parentage for inheritance purposes).

**16.** *See Minors under Age 16*, U.S. Dept. of State, U.S. Passports & Int'l Travel, http://travel.state.gov/passport/get/minors/minors_834.html (last visited Feb. 26 2014); *New U.S. Birth Certificate Requirement*, U.S. Dept of State, U.S. Passports & Int'l Travel, http://travel.state.gov/passport/passport_5401.html (last visited Feb. 26, 2014) (certified birth certificates listing full names of applicant's parents must be submitted with passport application as evidence of citizenship).

recognition ban. (Doc. 20 at 32–36). Defendants cite "the decision to preserve uniformly the traditional definition of marriage without regard to contrary determinations by some other jurisdictions," "avoiding judicial intrusion upon a historically legislative function," "assur[ing] that it is the will of the people of Ohio . . . that controls," "approaching social change with deliberation and due care," and "[p]reserving the traditional definition of marriage," although they raise these interests in the context of a rational basis equal protection analysis. (*Id.*) Although strict scrutiny is implicated by more than one fundamental right threatened by the marriage recognition ban, even in the intermediate scrutiny context, these vague, speculative, and/or unsubstantiated state interests rise nowhere near the level necessary to counterbalance the specific, quantifiable, particularized injuries detailed above suffered by same-sex couples when their existing legal marriages and the attendant protections and benefits are denied to them by the state. In particular, the Court notes that *given that all practicing attorneys, as well as the vast majority of all citizens in this country, are fully aware that unconstitutional laws cannot stand, even when passed by popular vote, Defendants' repeated appeal to the purportedly sacred nature of the will of Ohio voters is particularly specious.*

The stated interest in "preserving the traditional definition of marriage" is not a legitimate justification for Ohio's arbitrary discrimination against gays based solely on their sexual orientation. As federal judge John G. Heyburn II eloquently explained in invalidating Kentucky's similar marriage recognition ban:

> Many Kentuckians believe in "traditional marriage." Many believe what their ministers and scriptures tell them: that a marriage is a sacrament instituted between God and a man and a woman for society's benefit. They may be confused—even angry—when a decision such as this one seems to call into question that view. These concerns are understandable and deserve an answer.
>
> Our religious beliefs and societal traditions are vital to the fabric of society. Though each faith, minister, and individual can define marriage for themselves, at issue here are laws that act outside that protected sphere. Once the government defines marriage and attaches benefits to that definition, it must do so constitutionally. It cannot impose a traditional or faith-based limitation upon a public right without a sufficient justification for it. Assigning a religious or traditional rationale for a law, does not make it constitutional when that law discriminates against a class of people without other reasons.
>
> *The beauty of our Constitution is that is accommodates our individual faith's definition of marriage while preventing the government from unlawfully treating us differently. This is hardly surprising since it was written by people who came to America to find both freedom of religion and freedom from it.*

*Bourke v. Beshear*, 996 F.Supp.2d 542, 554, 2014 WL 556729, at *10 (W.D.Ky. Feb. 12, 2014) (emphasis supplied) (declaring Kentucky's anti-recognition provisions unconstitutional on equal protection grounds).

Defendants argue that *Windsor* stressed that "regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States." 133 S.Ct. at 2692. However, as this Court emphasized in *Obergefell*, this *state regulation of marriage is "subject to constitutional guarantees"* and "the fact that each state has the exclusive pow-

er to create marriages within its territory does not logically lead to the conclusion that states can nullify already-established marriages absent due process of law." 962 F.Supp.2d at 981.

Quintessentially, as the Supreme Court has held, marriage confers "a dignity and status of immense import." *Windsor*, 133 S.Ct. at 2692. When a state uses "its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhance[s] the recognition, dignity, and protection of the class in their own community." *Id.* Here, based on the record, Defendants have again failed to provide evidence of any state interest compelling enough to counteract the harm Plaintiffs suffer when they lose this immensely important dignity, status, recognition, and protection, as such a state interest does not exist.

Accordingly, Ohio's refusal to recognize same-sex marriages performed in other jurisdictions violates the substantive due process rights of the parties to those marriages because it deprives them of their rights to marry, to remain married, and to effectively parent their children, absent a sufficient articulated state interest for doing so.

## C. Equal Protection Clause

This Court's analysis in *Obergefell* also compels the conclusion that Defendants violate Plaintiffs' right to equal protection by denying recognition to their marriages and the protections for families attendant to marriage. In *Obergefell*, this Court noted Ohio's long history of respecting out-of-state marriages if valid in the place of celebration, with only the marriages of same-sex couples singled out for differential treatment. 962 F.Supp.2d at 983–84.

Under Ohio law, if the Henry/Rogers, Yorksmith, and Noe/McCracken couples' marriages were accorded respect, both spouses in the couple would be entitled to recognition as the parents of their expected children. As a matter of statute, Ohio respects the parental status of the non-biologically related parent whose spouse uses AI to conceive a child born to the married couple. *See* Ohio Rev.Code § 3111.95 (providing that if "a married woman" uses "non-spousal artificial insemination" to which her spouse consented, the spouse "shall be treated in law and regarded as" the parent of the child, and the sperm donor shall have no parental rights); *see also* Ohio Rev.Code § 3111.03 (providing that a child born to a married couple is presumed the child of the birth mother's spouse).

An Ohio birth certificate is a legal document, not a medical record. Birth certificates for newborn babies are generated by Defendants through use of the Integrated Perinatal Health Information System ("IPHIS") with information collected at birth facilities.[17] Informants are advised that "[t]he birth certificate is a document that will be used for important purposes including proving your child's age, citizenship and parentage. The birth certificate will be used by your child throughout his/

---

17. A suggested worksheet is provided to the hospital or other birth facility by the Ohio Department of Health for use by the birth mother or other informant. A copy of the worksheet can be found at Ohio Department of Health, http://vitalsupport.odh.ohio.gov/gd/gd.aspx?Page=3&TopicRelationID=5&Content=5994 (last visited Feb. 28, 2014). The hospital or birth facility then enters the information gathered into the IPHIS. Two flow sheets describing the typical sequence of steps leading to a birth certificate can be found at *Birth Facility Easy-Step Guide For IPHIS*, pages 4–5, Ohio Department of Health, http://vitalsupport.odh.ohio.gov/gd/gd.aspx?Page=3&TopicRelationID=519&Content=4597 (last visited Feb. 28, 2014).

her life." [18] *The Ohio Department of Health routinely issues birth certificates naming as parents both spouses to opposite-sex married couples who use AI to conceive their children.*[19] However, Defendants refuse to recognize these Plaintiffs' marriages and the parental presumptions that flow from them, and will refuse to issue birth certificates identifying both women in these couples as parents of their expected children. (Doc. 15 at ¶¶ 59–62).

Similarly, when an Ohio-born child is adopted by the decree of a court of another state, the Ohio Department of Health "shall issue ... a new birth record using the child's adoptive name and the names of and data concerning the adoptive parents." Ohio Rev.Code § 3705.12(A)(1). However, the Department of Health refuses to comply with this requirement based on Ohio Rev.Code § 3107.18(A), which provides that "[e]xcept when giving effect to such a decree would violate the public policy of this state, a court decree ... establishing the relationship by adoption, issued pursuant to due process of law by a court of any jurisdiction outside this state ... shall be recognized in this state."

Before Governor Kasich's administration and prior—Defendant Wymyslo's leadership of the Department of Health, Ohio recognized out-of-state adoption decrees of same-sex couples and supplied amended birth certificates identifying the adoptive parents. (*See* Docs. 4–6, 4–7, and 4–8). However, the current administration takes the position that issuing birth certificates under such circumstances would violate "public policy," *i.e.*, Ohio's purported limitation on adoptions within the State to couples only if those couples are married. O.R.C. § 3107.03(A). *If the Vitale/Talmas spouses were an opposite-sex couple, Defendant Himes would recognize their marriage, their New York adoption decree, and their right to an accurate birth certificate for Adopted Child Doe.*

## 1. Heightened Scrutiny

As the Court discussed in *Obergefell*, the Sixth Circuit has not reviewed controlling law regarding the appropriate level of scrutiny for reviewing classifications based on sexual orientation, such as Ohio's marriage recognition ban, since *Windsor*. 962 F.Supp.2d at 986. The most recent Sixth Circuit case to consider the issue, *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir.2012), rejected heightened scrutiny by relying on *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir.2006), which in turn relied on *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 293 (6th Cir.1997). As the Court concluded in *Obergefell*, however, *Equality Foundation* now rests on shaky ground and there are

---

18. *Mother's Worksheet for Child's Birth,* available at Ohio Department of Health, http://vitalsupport.odh.ohio.gov/gd/gd.aspx?Page=3&TopicRelationID=5&Content=5994 (last visited February 28, 2014).

19. *See* Ohio Rev.Code § 3111.03(A)(1) ("[a] man is presumed to be the natural father of a child," including when "[t]he man and the child's mother are or have been married to each other, and the child is born during the marriage or is born within three hundred days after the marriage is terminated by death, annulment, divorce, or dissolution or after the man and the child's mother separate pursuant to a separation agreement"); *see also* Ohio Rev.Code § 3111.95(A) ("If a married woman is the subject of a non-spousal artificial insemination and if her husband consented to the artificial insemination, the husband shall be treated in law and regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall be treated in law and regarded as the natural child of the husband."); Ohio Rev.Code § 3705.08(B) ("All birth certificates shall include a statement setting forth the names of the child's parents ...").

"ample reasons to revisit the question of whether sexual orientation is a suspect classification," including the fact that Sixth Circuit precedent on this issue—*Equality Foundation* among it—is based on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which was overruled by *Lawrence*, 539 U.S. at 558, 123 S.Ct. 2472. *Bassett v. Snyder*, 951 F.Supp.2d 939, 945–46 (E.D.Mich.2013) (same-sex couples demonstrated a likelihood of success on the merits of their equal protection claim regarding a Michigan law prohibiting same-sex partners from receiving public employer benefits).[20] The Supreme Court, in overruling *Bowers*, emphatically declared that it "was not correct when it was decided and is not correct today." *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472.

■ As a result, this Court held in *Obergefell* that lower courts without controlling post-*Lawrence* precedent on the issue should now apply the criteria mandated by the Supreme Court to determine whether sexual orientation classifications should receive heightened scrutiny. 962 F.Supp.2d at 987. The Court then analyzed the four factors that, to varying degrees, may be considered to determine whether classifications qualify as suspect or quasi-suspect: whether the class (1) has faced historical discrimination, (2) has a defining characteristic that bears no relation to ability to contribute to society, (3) has immutable characteristics, and (4) is politically powerless. *Id.* at 987–91. The Court concluded that "[s]exual orientation discrimination accordingly fulfills all the criteria the Supreme Court has identified,

thus Defendants must justify Ohio's failure to recognize same-sex marriages in accordance with a heightened scrutiny analysis," and finally that Defendants "utterly failed to do so." *Id.* at 991. Subsequent to *Obergefell*, the Ninth Circuit similarly held that *Windsor* "requires heightened scrutiny" for classifications based on sexual orientation. *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 484 (9th Cir.2014) ("we are required by *Windsor* to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection … Thus, there can no longer be any question that gays and lesbians are no longer a 'group or class of individuals normally subject to 'rational basis' review.' ") (citation omitted). The Court's entire *Obergefell* analysis applies and controls here, and classifications based on sexual orientation must pass muster under heightened scrutiny to survive constitutional challenge.

■ *Here, Defendants' discriminatory conduct most directly affects the children of same-sex couples, subjecting these children to harms spared the children of opposite-sex married parents. Ohio refuses to give legal recognition to both parents of these children, based on the State's disapproval of their same-sex relationships.* Defendants withhold accurate birth certificates from these children, burdening the children because their parents are not the opposite-sex married couples who receive the State's special stamp of approval. *The Supreme Court has long held that disparate treatment of children based on disapproval of their*

---

**20.** *See also Pedersen v. Office of Pers. Mgmt.*, 881 F.Supp.2d 294, 312 (D.Conn.2012) ("The Supreme Court's holding in Lawrence 'remov[ed] the precedential underpinnings of the federal case law supporting the defendants' claim that gay persons are not a [suspect or] quasi-suspect class" ') (citations omit-

ted); *Golinski*, 824 F.Supp.2d at 984 ("[T]he reasoning in [prior circuit court decisions], that laws discriminating against gay men and lesbians are not entitled to heightened scrutiny because homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence* ").

*parents' status or conduct violates the* *Equal Protection Clause.* *See, e.g., Plyler v. Doe,* 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (striking down statute prohibiting undocumented immigrant children from attending public schools because it "imposes its discriminatory burden on the basis of a legal characteristic over which the children can have little control").[21] Such discrimination also triggers heightened scrutiny. *See, e.g., Pickett v. Brown,* 462 U.S. 1, 8, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983).

The children in Plaintiffs' and other same-sex married couples' families cannot be denied the right to two legal parents, reflected on their birth certificates and given legal respect, without a sufficient justification. No such justification exists.

## 2. Rational Basis

As the Court further held in *Obergefell,* even if no heightened level of scrutiny is applied to Ohio's marriage recognition bans, they still fail to pass constitutional muster. 962 F.Supp.2d at 991. The Court noted that "[e]ven in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained," that "some objectives . . . are not legitimate state interests," and, even when a law is justified by an ostensibly legitimate purpose, that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Romer,* 517 U.S. at 632, 116 S.Ct.

1620; *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 446–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

*At the most basic level, by requiring that classifications be justified by an independent and legitimate purpose, the Equal Protection Clause prohibits classifications from being drawn for "the purpose of disadvantaging the group burdened by the law."* *Romer,* 517 U.S. at 633, 116 S.Ct. 1620 (emphasis supplied); *see also Windsor,* 133 S.Ct. at 2693; *City of Cleburne, Tex.,* 473 U.S. at 450, 105 S.Ct. 3249; *U.S. Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). This Court concluded by noting that in *Bassett,* 951 F.Supp.2d at 968–71, the court held that same-sex couples demonstrated a likelihood of success on the merits of their equal protection claim regarding a Michigan law prohibiting same-sex partners from receiving public employee benefits where "[t]he historical background and legislative history of the Act demonstrate that it was motivated by animus against gay men and lesbians." The Court further determined that a review of the historical background and legislative history of the laws at issue and the evidentiary record established conclusively that the requested relief must also be granted to Plaintiffs on the basis of the Equal Protection Clause. *Obergefell,* 962 F.Supp.2d at 993.

Again, the Court's prior analysis controls, and Ohio's marriage recognition bans also fail rational basis review.

---

21. *See also Mathews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) ("visiting condemnation upon the child in order to express society's disapproval of the parents' liaisons 'is illogical and unjust' "); *Weber v. Aetna Cas. Sur. Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) ("imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing"); *Walton v. Hammons,* 192 F.3d 590, 599 (6th Cir.1999) (holding state could not withhold children's food stamp support based on their parents' non-cooperation in establishing paternity of their children).

### 3. Potential State Interests

*This Court has already considered and rejected as illegitimate and irrational any purported State interests justifying the marriage recognition bans.* Obergefell, 962 F.Supp.2d at 993–95. Based on this controlling analysis, the government certainly cannot meet its burden under heightened scrutiny to demonstrate that the marriage recognition ban is necessary to further important State interests. All advanced State interests are as inadequate now as they were several months ago to justify the discrimination caused by the marriage recognition ban and the ban's particularly harmful impact on Ohio-born children.

Of particular relevance to this case, in *Obergefell* this Court analyzed and roundly rejected any claimed government justifications based on a preference for procreation or childrearing by heterosexual couples. 962 F.Supp.2d at 994. This Court further concluded that *the overwhelming scientific consensus, based on decades of peerreviewed scientific research, shows unequivocally that children raised by same-sex couples are just as well adjusted as those raised by heterosexual couples.* Id. at n. 20. In fact, the U.S. Supreme Court in *Windsor* (and more recently, numerous lower courts around the nation) similarly rejected a purported government interest in estab-

lishing a preference for or encouraging parenting by heterosexual couples as a justification for denying marital rights to same-sex couples and their families. The Supreme Court was offered the same false conjectures about child welfare this Court rejected in *Obergefell,* and the Supreme Court found those arguments so insubstantial that it did not deign to acknowledge them. Instead, the Supreme Court concluded:

> DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others. The federal statute is invalid, for *no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity.* By seeking to displace this protection and treating those persons as living in marriages less respected than others [the federal government's non-recognition of marriages is unconstitutional].

*Windsor,* 133 S.Ct. at 2696 (emphasis supplied). All of the federal trial court decisions since *Windsor* have included similar conclusions on this issue, including that child welfare concerns weigh exclusively in favor of recognizing the marital rights of same-sex couples.[22]

---

22. *See, e.g., De Leon,* 975 F.Supp.2d 632 (declaring unconstitutional Texas bans on same-sex marriage and out-of-state marriage recognition, and rejecting as irrational purported childrearing and procreation justifications); *Bostic,* 970 F.Supp.2d at 478 (declaring unconstitutional Virginia's marriage ban, which has the effect of "needlessly stigmatizing and humiliating children who are being raised" by same-sex couples and "betrays" rather than serves an interest in child welfare); *Bourke,* 996 F.Supp.2d at 553, 2014 WL 556729 at *8 (rejecting purported government interest in withholding marriage recognition to advance procreation and childrearing goals, and holding Kentucky's marriage recognition ban, similar to Ohio's, unconstitutional); *Bishop,* 962 F.Supp.2d at 1290–96 (rejecting purported government interests in responsible procreation and childrearing as justifications for Oklahoma's same-sex marriage ban, which was held unconstitutional); *Kitchen,* 961 F.Supp.2d at 1211–14 (declaring Utah's marriage ban unconstitutional and finding that same-sex couples' "children are also worthy of the State's protection, yet" the marriage ban "harms them for the same reasons that the Supreme Court found that DOMA harmed

In sum, under Supreme Court jurisprudence, and as confirmed in numerous recent trial court decisions, states do not have any governmental interest sufficient to justify their refusal to recognize lawful out-of-state marriages between same-sex couples.[23]

## D. Full Faith and Credit

Because this Court has found that Ohio's marriage recognition bans are constitutionally invalid on their face and unenforceable, Defendants no longer have a basis on which to argue that recognizing same-sex marriages on out-of-state adoption decrees violates Ohio public policy, and thus it is unnecessary to reach Plaintiffs' arguments based on the Full Faith and Credit Clause. However, the Court determines that, as expressed *infra* in endnote i, Plaintiffs have also demonstrated a compelling basis on which to find, and the Court does so find, that *Plaintiffs Vitale and Talmas have a right to full faith and credit for their New York adoption decree here in Ohio.*[24]

the children of same-sex couples"); *Griego v. Oliver,* — N.M. ——, 316 P.3d 865, 872 (2013) (rejecting "responsible procreation and childrearing" rationales to justify New Mexico's marriage ban, and declaring ban in violation of state constitution).

23. Again, the Court's Order today does NOT require Ohio to authorize the performance of same-sex marriage in Ohio. Today's ruling merely requires Ohio to *recognize* valid same-sex marriages lawfully performed in states which authorize such marriages.

24. Article IV, § 1 of the U.S. Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." In incorporating this clause into our Constitution, the Framers "foresaw that there would be a perpetual change and interchange of citizens between the several states." *McElmoyle, for Use of Bailey v. Cohen,* 38 U.S. 312, 315, 13 Pet. 312, 10 L.Ed. 177 (1839). The Supreme Court has explained that the "animating purpose" of the full faith and credit command is:

to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin. *Baker v. Gen. Motors Corp.,* 522 U.S. 222, 232, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) (quoting *Milwaukee Cnty. v. M.E., White Co.,* 296 U.S. 268, 277, 56 S.Ct. 229, 80 L.Ed. 220 (1935)).

In the context of judgments, the full faith and credit obligation is exacting, giving nationwide force to a final judgment rendered in a state by a court of competent jurisdiction. *Baker,* 522 U.S. at 233, 118 S.Ct. 657. Proper full faith and credit analysis distinguishes between public acts, which may be subject to public policy exceptions to full faith and credit, and judicial proceedings, which decidedly are not subject to any public policy exception to the mandate of full faith and credit *See id.* at 232, 118 S.Ct. 657 ("Our precedent differentiates the credit owed to laws (legislative measures and common law) and to judgments"); *Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 437, 64 S.Ct. 208, 88 L.Ed. 149 (1943) ("The full faith and credit clause and the Act of Congress implementing it have, for most purposes, placed a judgment on a different footing from a statute of one state, judicial recognition of which is sought in another").

The Supreme Court has thus rejected any notion that a state may disregard the full faith and credit obligation simply because the state finds the policy behind the out-of-state judgment contrary to is own public policies. According to the Court, "our decisions support no roving 'public policy exception' to the full faith and credit due judgments." *Baker,* 522 U.S. at 233, 118 S.Ct. 657; *see also Estin v. Estin,* 334 U.S. 541, 546, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948) (Full Faith and Credit Clause "ordered submission ... even to hostile policies reflected in the judgment of another State, because the practical operation of the federal system, which the Constitution designed, demanded it"); *Williams v. North Carolina,* 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942) (requiring North Carolina to recognize change in marital status effected by

Nevada divorce decree contrary to laws of North Carolina).

Consistent with the guarantee of full faith and credit, Defendant Himes's Department of Health is mandated under a provision of the Vital Statistics section of the Ohio Code to issue an amended birth certificate upon receipt of an adoption decree issued by the court of another state. Pursuant to Ohio Revised Code § 3705.12(A) and (B), upon receipt of a decree of adoption of an Ohio-born child, issued with due process by the court of another state, "the department of health shall issue, unless otherwise requested by the adoptive parents, a new birth record using the child's adopted name and the names of and data concerning the adoptive parents...." This statute does not leave discretion in Defendant Himes's hands to reject duly issued out-of-state adoption decrees based on whether the adoption could have been obtained under Ohio law.

Indeed, as already discussed, before the tenure of prior-Defendant Wymyslo, Ohio issued amended birth certificates based on the out-of-state adoption decrees of same-sex parents, notwithstanding Ohio's purported policy against adoptions by unmarried couples within the State. Only recently has the Department of Health taken the position that Ohio Revised Code. § 3107.18, a separate provision of the "Adoption" section of the Code, frees it of its obligation to issue a corrected birth certificate upon receipt of another state's duly issued judgment of adoption decreeing a same-sex couple as adoptive parents. (Doc. 4–6 at 4–5). According to Defendant Himes, that provision requires the Department of Health to refuse recognition to out-of-state adoption decrees of same-sex parents, whose marriages are disrespected under Ohio law, because "giving effect to such a decree would violate the public policy of this state." Ohio Revised Code § 3107.18.

This backward evolution in Ohio, from granting accurate birth certificates to adoptive same-sex parents and their children, to the current administration's refusal to do so, is yet another manifestation of the irrational animus motivating Defendants' discriminatory treatment of lesbian and gay families. The application of section 3107.18's "public policy" exception to the adoption decree of another state is contrary to Ohio's consistent recognition of the duly-issued adoption decrees of state courts of competent jurisdiction nationwide. *See, e.g., Matter of Bosworth*, No. 86–AP–903, 1987 WL 14234, at *2 (Ohio Ct.App.

10th Dist. July 16, 1987) (recognizing Florida adoption decree because, "if due process was followed by another state's court in issuing an adoption decree, an Ohio court is mandated to give full faith and credit to that state's decree"); *Matter of Swanson*, No. 90–CA–23, 1991 WL 76457 (Ohio Ct.App. 5th Dist. May 3, 1991) (recognizing New York adoption decree over objection of Ohio biological parents). Defendant Himes impermissibly injects a "roving 'public policy exception' to the full faith and credit due judgments," precisely what the Supreme Court has made clear the Full Faith and Credit Clause prohibits.

The duty to effectuate this command has commonly fallen on state courts in actions to enforce judgments obtained in out-of-state litigation, which is why many Supreme Court cases identify state courts as violators of the state's full faith and credit obligations. *See Adar v. Smith*, 639 F.3d 146, 171 (5th Cir. 2011) (Weiner, J., dissenting) (citing *Guinness PLC v. Ward*, 955 F.2d 875, 890 (4th Cir.1992) ("[U]nder the common law, the procedure to enforce the judgment of one jurisdiction in another required the filing of a new suit in the second jurisdiction to enforce the judgment of the first")). However, this historical fact does not dictate that the command is directed only to state courts. For example, now "all but two or three of the fifty states have enacted some version of the Revised Uniform Enforcement of Foreign Judgments Act, which authorizes nonjudicial officers to register out-of-state judgments, thereby entrusting to them their states' obligations under the [Full Faith and Credit] Clause." *Adar*, 639 F.3d at 171 (Weiner, J., dissenting) (citation omitted). Ohio's vital statistics statutes likewise transfer to state executive officials the responsibility to receive and recognize out-of-state judgments of adoption and to issue amended Ohio birth certificates based on those judgments. *See* Ohio Revised Code § 3705.12(A) and (B).

The Fifth Circuit stands *alone* in holding that federal claims to enforce rights conferred by the Full Faith and Credit Clause are unavailable under § 1983 against nonjudicial state officials. ·*Adar*, 639 F.3d at 153. Given that § 1983 creates a remedy for those denied "rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983, and that the Supreme Court has repeatedly held that § 1983 is a remedial statute that must be applied expansively to assure the protection of constitutional rights (*see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (§ 1983

## E. Irreparable Harm

 Finally, Plaintiffs have easily met their burden to demonstrate they are suffering irreparable harm from Defendants' violation of their rights to due process, equal protection, and full faith and credit

is "to be broadly construed, against all forms of official violation[s] of federally protected rights"); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (§ 1983's coverage is to be "broadly construed"); *Wayne v. Vill. of Sebring*, 36 F.3d 517, 528 (6th Cir.1994) (same)), other circuits have unremarkably entertained such claims. *See Rosin v. Monken*, 599 F.3d 574, 575 (7th Cir.2010) (adjudicating full faith and credit claim against state actors on the merits in § 1983 action); *United Farm Workers v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir.1982) (same); *Lamb Enters., Inc. v. Kiroff*, 549 F.2d 1052, 1059 (6th Cir.1977) (propriety of § 1983 claim in federal court to enforce full faith and credit obligation against state judge not questioned, but abstention deemed warranted).

The Supreme Court has employed a three-part test, articulated in *Golden State Transit Corp.*, 493 U.S. at 106, 110 S.Ct. 444, to determine whether a constitutional provision creates a right actionable under § 1983: whether the provision 1) "creates obligations binding on the governmental unit," 2) that are sufficiently concrete and specific as to be judicially enforced, and 3) were "intended to benefit the putative plaintiff." *Dennis v. Higgins*, 498 U.S. 439, 449, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (internal quotations and citations omitted). The Full Faith and Credit Clause explicitly creates obligations binding on the states, is concrete and judicially recognizable, and was intended to protect the rights of individuals to require respect across state lines for judgments in their favor. *See Thomas v. Wash. Gas Light Co.*, 448 U.S. 261, 278 n. 23, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980) ("[T]he purpose of [the Clause] was to preserve rights acquired or confirmed under the ... judicial proceedings of one state by requiring recognition of their validity in other states ....") (quoting *Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 501, 59 S.Ct. 629, 83 L.Ed. 940 (1939)); *Magnolia Petroleum Co.*, 320 U.S. at 439, 64 S.Ct. 208 (referring to the Clause as preserving judicially established "rights"); *see also Adar*, 639 F.3d at 176 (Weiner, J., dissenting) ("For all the same reasons advanced by the Dennis Court in recognizing the private federal right created by the Commerce Clause ... the [Full Faith and Credit] Clause indisputably does confer a constitutional 'right' for which § 1983 provides an appropriate remedy").

In *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir.2007), a § 1983 action, the Tenth Circuit held that Oklahoma was required to issue an amended birth certificate listing as parents both members of a California same-sex couple that had legally adopted a child born in Oklahoma, notwithstanding Oklahoma's prohibition against such adoptions within the state. *Id.* at 1141–42. Oklahoma, like Ohio, had a statute providing for issuance of amended birth certificates for children adopted in other states' courts. The Tenth Circuit ruled that the Full Faith and Credit Clause required Oklahoma "to apply its own law to enforce [those] adoption order[s] in an 'even-handed' manner." *Id.* at 1154 (citing *Baker*, 522 U.S. at 235, 118 S.Ct. 657). The Tenth Circuit concluded: "We hold today that final adoption orders and decrees are judgments that are entitled to recognition by all other states under the Full Faith and Credit Clause." *Id.* at 1156. Oklahoma's "refusal to recognize final adoption orders of other states that permit adoption by same-sex couples" was therefore "unconstitutional." *Id.*

The principles and precedent outlined above provide a compelling basis to conclude that the Full Faith and Credit Clause also requires full recognition of Plaintiffs Vitale's and Talmas's New York adoption decree, and this Court so holds.

(As in *Obergefell*, this Court again acknowledges the continuing pendency of Section 2 of the discredited federal Defense of Marriage Act ("DOMA"), which was not before the Supreme Court in *Windsor*, and wherein Congress has sought to invoke its power under the Full Faith and Credit Clause to establish that "[n]o State ... shall be required to give effect to any public act, record, or judicial proceeding of any other State ... respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State," 28 U.S.C. § 1738C. However, as in *Obergefell*, although Section 2 of DOMA is not specifically before the Court, the implications of today's ruling speak for themselves.)

for their adoption decrees. Birth certificates are vitally important documents. As outlined above, Ohio's refusal to recognize Plaintiffs' and other same-sex couples' valid marriages imposes numerous indignities, legal disabilities, and psychological harms. Further, the State violates Plaintiffs' and other same-sex couples' fundamental constitutional rights to marry, to remain married, and to function as a family.

"Constitutional violations are routinely recognized as causing irreparable harm unless they are promptly remedied." *Obergefell,* 962 F.Supp.2d at 996; *see also Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Saenz v. Roe,* 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (violation of the right to travel interstate constitutes irreparable injury). Without a permanent injunction and declaratory relief, the affected same-sex couples and their children would have to continue to navigate life without the birth certificates that pave the way through numerous transactions, large and small. They would needlessly suffer harmful delays, bureaucratic complications, increased costs, embarrassment, invasions of privacy, and disrespect. Same-sex couples' legal status as parents will be open to question, including in moments of crisis when time and energy cannot be spared to overcome the extra hurdles Ohio's discrimination erects.[25] The marital status of the couples will likewise be open to question, depriving these families of the far-reaching security, protections, and dignity that come with recognition of their marriages.

Plaintiffs and other affected same-sex couples require injunctive and declaratory relief to lift the stigma imposed by Defendants' disrespect for their spousal and parental statuses. Imposition of these burdens on same-sex couples serves no legitimate public interest that could counteract the severe and irreparable harm imposed by the marriage recognition bans.

Plaintiffs have therefore more than adequately demonstrated their entitlement to declaratory and injunctive relief.[26]

---

25. For example, families can be barred in hospitals from their loved ones' bedsides due to a lack of legally-recognized relationship status. (*Id.* Doc. 17–3 at ¶ 23). And, although Ohio same-sex couples may obtain co-custody agreements for their children, such an agreement "does not ... create the full rights and responsibilities of a legally recognized child-parent relationship." (*Id.* at ¶ 19). Moreover, inheritance is governed in part by parentage (*Id.* at ¶¶ 21, 24, 30), and children are entitled to bring wrongful death actions (Doc. 17–7 at ¶ 37). Indeed, "[s]ame-sex married couples and their children live in an Ohio that automatically denies most state and federal rights, benefits and privileges to them." (*Id.* at ¶ 103).

26. However, the Court agrees with Defendants that Plaintiff Adoption S.T.A.R. lacks standing to pursue its claims. Rather than relying on its own rights, Adoption S.T.A.R. purports to bring this action "on behalf of its clients who seek to complete adoptions" involving Ohio-born children and seeks relief for any ... "same-sex couples married in [other] jurisdiction ... who become clients of Plaintiff Adoption S.T.A.R...." (Doc. 1 at 17). To establish Article III standing, a plaintiff must show that an injury is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Intern. USA,* —— U.S. ——, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (internal quotations omitted). Adoption S.T.A.R. bears the burden of proving each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

## IV. CONCLUSION

Accordingly, based on the foregoing,

"[A] party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (internal quotations omitted). If a party can demonstrate injury, however, that party may pursue the rights of others when it can establish that (1) "the party asserting the right has a 'close' relationship with the person who possesses the right" and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Boland v. Holder*, 682 F.3d 531, 537 (6th Cir.2012) (internal quotations omitted). The concept of third-party standing is typically disfavored. *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564; *see also Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (outlining reasons why "[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation").

Here, Adoption S.T.A.R. fails to satisfy its burden of establishing standing because it fails to satisfy the hindrance requirement. Adoption S.T.A.R. must demonstrate that its clients face some obstacle "in litigating their rights themselves." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 209 (6th Cir.2011). In analyzing this question, the United States Supreme Court has generally looked for "daunting" barriers or "insurmountable procedural obstacles" to support a finding of hindrance. *See Miller v. Albright*, 523 U.S. 420, 449–50, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., concurring, Kennedy, J., joining) ("A hindrance signals that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so"). Adoption S.T.A.R. has not shown that same-sex couples married in other jurisdictions are hindered from litigating their own rights, and the participation of the other Plaintiffs in this lawsuit demonstrates that such parties are capable of doing so. Moreover, because birth certificates can be amended and reissued, there are no significant time restrictions on the ability of potential third parties to bring their own actions. *Under these circumstances, where the time constraints and logistical and emotional burdens that prevented injured third parties from vindi-*

Plaintiffs' Motion for Declaratory Judg-

*cating their rights in Obergefelldo not exist, there is no basis for departing from the ordinary rule that "one may not claim standing ... to vindicate the constitutional rights of some third party."* *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

Consequently, the Court finds that Plaintiff Adoption S.T.A.R. lacks standing to pursue its claims. The Court also notes, however, that given today's ruling, *the question of Adoption S.T.A.R.'s standing is ultimately of no practical effect.*

**Happy Adoption Day**

Words and Music by John McCulcheon

© 1992 John McCutcheon/Appalsongs (ASCAP)

Oh who would have guessed, who could have seen
Who could have possibly known
All these roads we have traveled, the places we've been
Would have finally taken us home.
So here's to you, three cheers to you
Let's shout it, "Hip, hip horray!"
For out of a world so tattered and torn,
You came to our house on that wonderful morn
And all of a sudden this family was born
Oh, happy Adoption Day!
There are those who think families happen by chance
A mystery their whole life through
But we had a voice and we had a choice
We were working and waiting for you.
So here's to you, three cheers to you
Let's shout it, "Hip, hip horray!"
For out of a world so tattered and torn,
You came to our house on that wonderful morn
And all of a sudden this family was born
Oh, happy Adoption Day!
No matter the time and no matter the age
No matter how you came to be
No matter the skin, we are all of us kin
We are all of us one family.
So here's to you, three cheers to you
Let's shout it, "Hip, hip horray!"
For out of a world so tattered and torn,
You came to our house on that wonderful morn
And all of a sudden this family was born
Oh, happy Adoption Day!

ment and Permanent Injunction (Doc. 18) is hereby **GRANTED**. Specifically:

1. The Court finds that those portions of Ohio Const. Art. XV, § 11, Ohio Rev.Code § 3101.01(C), and any other provisions of the Ohio Revised Code that may be relied on to deny legal recognition to the marriages of same-sex couples validly entered in other jurisdictions, violate rights secured by the Fourteenth Amendment to the United States Constitution in that same-sex couples married in jurisdictions where same-sex marriage is lawful, who seek to have their out-of-state marriages recognized and accepted as legal in Ohio and the enjoy the rights, protections, and benefits of marriage provided to heterosexual married couples under Ohio law, are denied significant liberty interests and fundamental rights without due process of law and in violation of their right to equal protection.

2. Defendants and their officers and agents are permanently enjoined from (a) enforcing the marriage recognition ban, (b) denying same-sex couples validly married in other jurisdictions all the rights, protections, and benefits of marriage provided under Ohio law, and (c) denying full faith and credit to decrees of adoption duly obtained by same-sex cou-

ples in other jurisdictions. The Court will separately issue an Order of Permanent Injunction to this effect.

3. Defendants shall issue birth certificates to Plaintiffs for their children listing *both* same-sex *parents*.

**IT IS SO ORDERED.**[27]

**27.** The Court STAYS enforcement of this Order and the Permanent Injunction until the parties have briefed whether or not this Court should fully stay its Orders until completion of appeal to the United States Court of Appeals for the Sixth Circuit and the United States Supreme Court. The Court is inclined to stay its finding of facial unconstitutionality but not to stay the Orders as to the as-applied claims of the four couples who are Plaintiffs because they have demonstrated that a stay will harm them individually due to the imminent births of their children and other time-

sensitive concerns. The Court inclines toward a finding that the issuance of correct birth certificates for Plaintiffs' children, due in June or earlier, should not be stayed. The Court is further inclined to conclude that the Defendants will not be harmed by compliance with the requirements of the United States Constitution. Nevertheless, Plaintiffs shall file today their memorandum *contra* Defendants' oral motion to stay, and Defendants shall file a reply memorandum before 3:00 p.m. tomorrow. The Court shall then rule expeditiously.